UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Case No. 2:16-cr-69 |
| DENNY REYES, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS
(Doc. 17)

This matter came before the court on June 26, 2017 for an evidentiary hearing on Defendant Denny Reyes's motion to suppress physical evidence and statements (Doc. 17). Defendant contends that law enforcement stopped his vehicle without reasonable suspicion of criminal activity and that he was arrested without probable cause. The government opposes the motion, arguing that the totality of the circumstances established both reasonable suspicion and probable cause. After the parties submitted supplemental briefing on June 28, 2017 and July 6, 2017, the court took the motion under advisement.

Pursuant to a one-count Indictment, Defendant is charged with bringing or attempting to bring aliens into the United States for the purpose of commercial advantage or private financial gain, knowing or in reckless disregard of the fact that they had not received prior authorization to enter the United States, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2. The government is represented by Assistant United States Attorney Kevin J. Doyle. Defendant is represented by Assistant Federal Public Defender David L. McColgin.

### I.   Findings of Fact.

On December 29, 2014, a source of information ("SOI") contacted the U.S. Border Patrol ("USBP") in Swanton, Vermont and advised that the SOI was offered and accepted compensation to act as a lookout for USBP activity in the Ballard Road area of Highgate,

Vermont. Ballard Road is a rural two-lane road that runs north-south for approximately two miles before it terminates at the United States-Canadian border. There is no port of entry in this remote location and the international border is marked only by a red gate and stone monuments. Approximately seven residences are located along the northern portion of Ballard Road, with hundreds of yards separating each residence. The typical traffic pattern is confined to local vehicular and pedestrian traffic during the day, with even less traffic at night. Ballard Road is a known "hot spot" for contraband and alien smuggling in which numerous arrests and interdictions have taken place. Approximately 1.3 miles south of the border, Ballard Road intersects with Partlow Road which runs east-west.

Through a series of interviews, the SOI advised USBP that between the hours of 12:00 a.m. and 1:00 a.m. on December 29, 2014, the SOI observed two vehicles and three male subjects at the northern end of Ballard Road in close proximity to the border. After the SOI approached two of the males, they identified themselves as "Danny" and "Angel." The SOI advised that s/he was fairly certain "Danny's" last name began with an "R." The SOI described "Danny" as a black male with a small build and noted that the two vehicles were a black SUV with New York license plates and a dark Volkswagen sedan with Massachusetts plates. "Danny" instructed the SOI that if USBP inquired, the SOI should state that "Danny" and "Angel" were friends visiting the SOI at his/her home at the end of Ballard Road.

The SOI further reported to USBP that s/he had witnessed "Danny" unlocking the rear hatch of the black SUV and heard what sounded like heavy bags being placed in the back of the vehicle. "Danny" thanked the SOI and paid him/her $160.00. "Danny" asked for the SOI's phone number. In response, the SOI asked "Danny" to provide his phone number instead. "Danny" provided cell phone number (347) 753-3794 and subsequently sent the SOI a photograph of himself standing in front of a black Toyota Highlander with New York license plate number GMH8035. USBP performed a records check and confirmed that the black 2014 Toyota Highlander was registered to Defendant Denny P. Reyes-Rosario, who resides in New York, New York.

2

Thereafter, the SOI advised USBP that "Danny" had placed a call to him/her on January 11, 2015 and that, based on a text message s/he received from "Danny," the SOI believed that "Danny" had made another trip to Vermont and had returned to New York. On January 12, 2015, the SOI placed a recorded call to "Danny's" cell phone. "Danny" confirmed that he had called the previous day, thanked the SOI for helping him, and advised that he wanted to see the SOI and "do a job."

On January 16, 2015, "Danny" called the SOI and the call was recorded. When asked when he planned to return to Vermont, "Danny" advised in broken English that he thought his friend would call him that day, but he may go the following day instead and that when he returns to Vermont he will come with friends because he needs help. The following day, the SOI placed a recorded phone call to "Danny" in which, among other things, "Danny" asked the SOI to drive around prior to "Danny's" next arrival in Vermont to make sure no one was in the area.

On January 22, 2015, law enforcement applied for a search warrant to obtain ongoing, real-time location information for thirty days for a target cell phone associated with the phone number "Danny" provided to the SOI. That same day, Magistrate Judge John M. Conroy authorized a search warrant to "ping" the target cell phone for a period of thirty days. Based on the location data derived from the "pings," on the evening of February 6, 2015, law enforcement located the target cell phone in the Bronx and then tracked it as it moved north on Interstate 87 in New York to the Grand Isle Ferry. The target cell phone then entered Vermont and proceeded north on Interstate 89 in Vermont towards the international border. Once in Vermont, law enforcement followed a black Toyota Highlander with New York license plate number T663935C to which the target cell phone was traced. Law enforcement confirmed through a license plate check that the Toyota Highlander was registered to Defendant.

As part of the cell phone tracking, Vermont State Police Corporal George Rodriguez was parked in an unmarked police cruiser on the northbound ramp of exit 21 on Interstate 89 conducting surveillance. He observed a black Toyota Highlander with New York plates and distinctive, after-market, blue-tinted headlights. He followed the

vehicle to exit 22, the last exit before the international border, and then proceeded to the parking lot of a duty free store where he consulted with a USBP agent who instructed him to proceed to the intersection of Ballard Road and Partlow Road. Corporal Rodriguez arrived at the intersection at approximately 12:30 a.m. on the morning of February 7, 2015. At the time, there was intermittent snowfall, the temperature was freezing, and the roads were slippery. Corporal Rodriguez parked his unmarked cruiser at the intersection so that he could observe all passing traffic.

During this same time period, six USBP agents wearing night-vision goggles and camouflage concealed themselves in pairs at three locations in a forested area at the northernmost part of Ballard Road, approximately fifty to seventy-five yards from the international border. One of the agents advised by USBP radio that he witnessed four persons cross the border on foot and stand behind an abandoned trailer. Shortly thereafter, USBP Agent Corey Belida witnessed a dark-colored SUV travelling at a high rate of speed northbound with New York plates. He credibly testified that it was "very uncommon" to see a vehicle travelling rapidly on Ballard Road at that time of night, especially with out-of-state plates. When the vehicle reached the end of Ballard Road, it turned around quickly and parked facing south. Another USBP agent radioed that four individuals had emerged from behind the abandoned trailer and were quickly approaching the parked dark SUV. In response, the USBP agents decided to announce their presence by calling out "U.S. Border Patrol" and deploying a "flash bang," which is a device that emits a loud noise and bright lights for the purpose of surprising, stopping, distracting, and/or temporarily blinding a suspect. In general, individuals tend to freeze and lose their night vision in response to a "flash bang." In this instance, however, three of the individuals moved more rapidly towards the dark SUV while the fourth individual ran back into Canada. The dark SUV, carrying three occupants, then sped away before the passenger doors had fully closed.

The USBP agents reported by radio that the dark SUV with New York plates was travelling southbound at a high rate of speed on Ballard Road with three individuals who had crossed the border illegally. Corporal Rodriguez heard this communication over his

4

radio and was instructed to stop the vehicle. Other law enforcement officers located south of Corporal Rodriguez were instructed to use spike strips to stop the vehicle if it reached their position.

Not more than one minute later, Corporal Rodriguez observed a vehicle travelling towards his location at a higher rate of speed than was safe for the inclement conditions. He noticed the vehicle had the same distinctive blue headlights that he had noticed previously on the black Toyota Highlander he had followed in response to the location monitoring of the target cell phone. It was the first vehicle he had observed since taking up his position at the intersection of Ballard Road and Partlow Road. Corporal Rodriguez activated his vehicle's blue lights in order to effect a motor vehicle stop. In response, the Toyota Highlander slowed down without appearing to come to a complete stop. Corporal Rodriguez pulled his cruiser into the southbound lane, causing the black Toyota Highlander to stop approximately twenty to twenty-five feet from his cruiser. Corporal Rodriguez turned on his cruiser's spotlight, exited and drew his AR-15 patrol rifle, which was equipped with an external light source. He considered the stop a "felony stop" to detain the vehicle and its occupants until USBP agents responded to the scene.

Corporal Rodriguez observed four people in the vehicle but he could not immediately discern their race or gender. He instructed the vehicle's occupants to "show me your hands" and directed his patrol rifle at the vehicle. The operator, later identified as Defendant, repeatedly put his hands down and was repeatedly told to keep them in the air. USBP personnel arrived within minutes, removed the three passengers from the vehicle, and determined that they were not United States citizens and had entered the United States illegally. Agent Belida also responded to the scene and observed that the vehicle stopped at the intersection of Ballard Road and Partlow Road was the same vehicle he had witnessed at the northern end of Ballard Road minutes before. Defendant and the three passengers were arrested and transported to a USBP station for processing.

II.     **Conclusions of Law and Analysis.**

   A.   **Whether the Vehicle Stop Was Based Upon Reasonable Suspicion of Criminal Activity.**

Defendant challenges whether reasonable suspicion existed to justify Corporal Rodriguez's seizure of the Toyota Highlander. Consistent with the Fourth Amendment, a brief investigative stop may be made based upon reasonable suspicion that "criminal activity may be afoot[.]" *Terry v. Ohio*, 392 U.S. 1, 30 (1968). To conduct such a stop, the officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less demanding than that for probable cause[.]" *United States v. Sokolow*, 490 U.S. 1, 7 (1989). However, an officer's "inchoate and unparticularized suspicion or 'hunch'" is insufficient to support a stop. *Terry*, 392 U.S. at 27.

In forming reasonable suspicion, law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); *see also Cortez*, 449 U.S. at 419 ("[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion.").

In determining the validity of an investigative stop, the court must consider "the totality of the circumstances—the whole picture" facing the detaining officer. *Id.* at 417. The facts must not be evaluated "in isolation from each other" because "each of [a] series of acts . . . perhaps innocent in itself" collectively may "warrant[] further investigation." *Arvizu*, 534 U.S. at 274 (internal quotation marks omitted) (citing *Terry*, 392 U.S. at 22).

When a vehicle stop is effected in close proximity to the international border, the officer may be "aware of specific articulable facts, together with rational inferences from

6

those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). Facts that may be considered include:

> (1) characteristics of the area where the vehicle is found; (2) its proximity to the border; (3) usual traffic patterns on that road; (4) previous experience with alien traffic in the area; (5) recent information about specific illegal border crossings there; (6) the driver's behavior, such as attempting to evade officers; (7) characteristics of the vehicle itself; and (8) the appearance of persons in the vehicle, such as mode of dress.

*United States v. Singh*, 415 F.3d 288, 294 (2d Cir. 2005) (citing *Brignoni-Ponce*, 422 U.S. at 884-85). When the officer has a reasonable suspicion of criminal activity, "he may stop the car briefly and . . . question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances[.]" *Brignoni-Ponce*, 422 U.S. at 881-82.

In this case, the totality of the circumstances overwhelmingly established reasonable suspicion that the operator of the black Toyota Highlander was engaged in criminal activity. On the evening in question, location monitoring of the target cell phone led law enforcement to follow a New York-registered black Toyota Highlander, which had proceeded from New York City in the late evening hours to a remote and sparsely populated area in Vermont in close proximity to the international border. The area was a known "hot spot" for alien and contraband smuggling with minimal vehicular traffic. With the exception of its license plate number, Defendant's vehicle closely matched a vehicle described by the SOI as engaged in apparent border smuggling.

The Toyota Highlander was the only vehicle observed on Ballard Road shortly after an illegal border crossing witnessed by multiple USBP agents. Law enforcement had previously determined that both license plate numbers for the black Toyota Highlander were registered to Defendant. Law enforcement had also established that Defendant was likely the "Danny R." who had paid the SOI to be on the lookout for USBP. On the night in question, the black Toyota Highlander was equipped with the

same distinctive blue-tinted headlights that were observed on the vehicle carrying the target cell phone earlier that evening.

When USBP agents approached the black Toyota Highlander and announced their presence, its operator evaded the agents and drove southbound on Ballard Road at an unsafe speed. The vehicle continued at that speed until Corporal Rodriguez activated his blue lights and drove his police cruiser into the southbound lane in order to stop the Toyota Highlander. Based on the totality of these circumstances, there can be no serious question that there was a reasonable, articulable suspicion that the operator of the black Toyota Highlander was involved in the illegal entry of three individuals into the United States. As a result, Corporal Rodriguez was permitted to stop the Toyota Highlander and detain its occupants for further investigation. Defendant's motion to suppress for lack of a reasonable suspicion for the traffic stop is therefore DENIED.

    **B.**    **Whether Defendant's Arrest Was Supported by Probable Cause.**

Defendant contends that because Corporal Rodriguez drew his patrol rifle while effecting the stop of the Toyota Highlander, his seizure was converted into a formal arrest requiring probable cause. "[P]robable cause is necessary when police restrain an individual in a manner that, though not technically an arrest, is nonetheless so intrusive as to be 'tantamount' to an arrest." *United States v. Marin*, 669 F.2d 73, 81 (2d Cir. 1982). "A permissible investigative stop may become an unlawful arrest if the means of detention are 'more intrusive than necessary.'" *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (quoting *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993)).

> In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used."

*United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (quoting *Perea*, 986 F.2d at 645).

8

"[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (quoting *Terry*, 392 U.S. at 24). The Supreme Court and the Second Circuit have recognized that "a car-stop is especially hazardous and supports the need for added safeguards." *United States v. Alexander*, 907 F.2d 269, 273 (2d Cir. 1990); *accord Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (observing that "roadside encounters between police and suspects are especially hazardous"). For this reason, "[a] display of guns by the police . . . does not automatically convert a stop into an arrest." *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir. 1984). Instead, "there is no hard and fast rule concerning the display of weapons in investigative stops[,]" and a court "must look at the nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, [and] the reaction of the suspect to the approach of police[.]" *Id.* (citation and internal quotation marks omitted).

Here, Corporal Rodriguez trained his patrol rifle on the Toyota Highlander after it appeared to be evading his efforts to stop it. The stop took place in a deserted location in the early morning hours. Corporal Rodriguez was alone and knew that the Toyota Highlander potentially contained four individuals, three of whom had crossed the border illegally just minutes prior to the stop. *See Alexander*, 907 F.2d at 273 (holding that where the "individuals stopped were suspected of having just completed a narcotics purchase" and "were observed driving evasively," it was "not . . . unreasonable that the officers decided it was appropriate to protect themselves by unholstering their guns"). He did not, however, know whether the occupants of the vehicle were armed and dangerous. At the very least, he had reason to believe that if he did not make a display of force, the operator of the Toyota Highlander may attempt to evade him just as he had evaded Corporal Rodriguez's USBP counterparts at the end of Ballard Road. *See Terry*, 392 U.S. at 27 (stating that "[t]he officer need not be absolutely certain that the individual is

armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger").

Thereafter, the facts giving rise to reasonable suspicion, coupled with the close temporal and geographic proximity between the illegal border crossing and the stop, rendered it probable that Defendant, as the operator of the Toyota Highlander, had participated in illegal felony activity. Defendant's evasive and non-compliant behavior during the stop only buttressed that conclusion. Probable cause for his arrest was thus clearly established. *See United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990) (stating that "[p]robable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested").

Defendant's motion to suppress on the grounds that he was arrested without probable cause is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the court hereby DENIES Defendant's motion to suppress physical evidence and statements. (Doc. 17.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 27th day of July, 2017.

Christina Reiss, Chief Judge
United States District Court